# United States Court of Federal Claims

July 14, 2014
No. 11-187 C

_____

**JMR CONTRUCTION CORP.,**

　　　　　　*Plaintiff*,

**v.**

**UNITED STATES OF AMERICA,**

　　　　　　*Defendant*.

_____

Eichleay damages; Field overhead
damages; Home office overhead
damages; Contract Disputes Act;
Summary judgment.

## OPINION

　　William Harrell Nellis, born March 8, 1916, was a distinguished fighter pilot during World War II.[1]  As a member of the United States Air Force's 513th Fighter Squadron, Lieutenant Nellis participated in 70 aerial combat missions, most of which were in support of General George Patton's 3rd Army.  He was shot down three times in service to his country.  Regrettably, during Lt. Nellis' final flight on December 27, 1944, ground fire struck his plane while he was strafing a German convoy as part of a sortie during the Battle of the Bulge.

　　Already a decorated soldier, Lt. Nellis was posthumously awarded the Purple Heart for his final act of bravery.  To further honor Lt. Nellis' sacrifice, the United States Air Force renamed the Las Vegas Air Force Base "Nellis Air Force Base" on April 30, 1950.  In the case at bar, the base is the site of a very different type of conflict, a breach of contract claim.  Its genesis is plaintiff's (JMR Construction Corp. or "JMR") contract with the United States Army Corps of Engineers ("COE") to build an aircraft maintenance facility on Nellis Air Force Base.  Compl. ¶ 5.

　　JMR's complaint, filed on March 25, 2011, states a claim for money damages under the Contract Disputes Act of 1978,  41 U.S.C. §§ 601-613, arising from an alleged breach of their contract with the COE.  Compl. ¶ 1.  JMR avers that the COE breached JMR's contract by causing delays to essential, or "critical path," elements of the construction plan.  Compl. ¶¶ 12-15.  JMR contends that the project's delays were caused by the COE's refusal to adhere to the agreement's provisions for contract modification.  *Id*.  In its complaint, plaintiff alleges these project delays caused $428,261.44 in damages for field office overhead, home office overhead, bonding and fee damages, painting expenses, scheduling costs, and consulting costs.  Compl. ¶ 4.

---

[1] This and other information on Lieutenant Nellis' service to our country can be found online at http://www.nellis.af.mil/library/factsheets/factsheet.asp?id=4095.

This case is now before the court on defendant's motion for partial summary judgment, pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). Defendant contends that, as a matter of law, plaintiff is not entitled to field overhead damages from the period of February 4 to September 4, 2009, home office overhead damages *in toto*, the portion of bonding/insurance and fee damages derived from these amounts, and damages for painting expenses, scheduling costs, and consulting costs.  Def's S.J. Mot. at 9-10.

Plaintiff does not oppose summary judgment on its alleged damages for painting expenses, scheduling costs, consulting costs.  Pl.'s Resp. at 12-13.  Plaintiff also concedes that it is not entitled to its alleged home office overhead damages for the period of December 11, 2009 through January 15, 2009.  *Id.*  Nonetheless, plaintiff continues to seek damages for home office overhead, field overhead costs, and bonding/insurance and fee damages[2] for the period of January 16, 2008 to September 4, 2009.

Defendant argues that field overhead damages are inappropriate because JMR "did not occupy the field."  Def.'s S.J. Mot. at 11.  Defendant contends that home office overhead damages are not available because plaintiff does not satisfy the legal test the United States Court of Appeals for the Federal Circuit (the "Circuit") has adopted for this type of damages, as originally set out in *Eichleay Corp.*, ASBCA No. 5183, 60-2 B.C.A. (CCH) 2688, 1960 WL 538 (1960).  *See e.g., E.R. Mitchell Constr. Co. v. Danzig*, 175 F.3d 1369 (Fed. Cir. 1999). Defendant also avers that, to the extent that plaintiff's other claimed damages for bond/insurance and fees are derived from plaintiff's field and home overhead amounts, those damages are unavailable.

As explained below, the court will grant defendant's motion in part and deny it in part. With respect to field overhead damages, home office overhead damages from January 16 to February 3, and bonding/insurance and fee damages the court will deny defendant's motion for partial summary judgment.  But, the court will grant defendant's motion with regard to home office overhead damages from February 4 to September 4, 2009.

## I. BACKGROUND

On June 26, 2007, JMR contracted with the COE for the construction of an aircraft maintenance facility on Nellis Air Force Base.  Compl. ¶ 5; Def.'s S.J. Mot. at 3.  The contract projected a 420 day performance period, anticipating construction would be completed by October 6, 2008.  Compl. ¶ 7; Def.'s S.J. Mot. at 3.  But, as explained below, this completion date would not be met.  Final project work was not finalized until almost a year later, on September 2, 2009.  Compl. ¶ 7; Def.'s S.J. Mot. at 2.

Complications began to delay construction in March and April of 2008 and would continue to plague the project through January of 2009.  Def.'s S.J. Mot. at 3-5; Pl.'s Resp. at 3-7.  These initial problems included facility issues, problems with the building's design, as well as base-wide schedule conflicts.  *Id.*  In total, these setbacks added 59 days to the project's completion date and necessitated four separate contract modifications.[3]  *Id.*

---

[2] These terms are defined below.

[3] The first modification expanded the deadline by seven days due to a broken water line and a base-wide security exercise interrupting construction.  A249-51.  The second extended the date by 34 days due to delays in designing

Faulty steel also delayed the project. Def.'s S.J. Mot. at 3-4; Pl.'s Resp. at 4. On July 10, 2008, JMR discovered the first load of structural steel did not conform to thickness standards. *Id.* To mitigate potential delay, JMR accelerated its pace, working a "two-shift" operation from August 6, 2008 through November 7, 2008 in an effort to get construction back on schedule. *Id.* Nevertheless, steel-related problems delayed construction through at least December 10, 2008.[4] *Id.*

Although these delays took place before the period at issue, they affected the project through early January of 2009. *Id.* From January 1 to January 16, JMR continued to perform substantial work on-site, with its workforce averaging 37 hours of work per day. A309-32.[5] On January 14, the facility was complete enough for the COE to take possession, or "beneficial occupancy," of the facility. Def.'s S.J. Mot. at 5; Pl.'s Resp. at 3-4. From that point onward, JMR's work slowed to roughly 10 hours per day. A309-32. During this period JMR installed temporary lighting in a room referred to by the parties as "Room 109." Def.'s S.J. Mot. at 5; Pl.'s Resp. at 5-6. Notably, the parties dispute the nature of the work performed in January. Defendant argues the work was significant. Def.'s Reply at 7. Plaintiff argues the work was "minor." Pl.'s Proposed Finding of Disputed Facts ¶ A.3.

By January 29, completed work was significant enough that JMR's Quality Control Manager Marcia Kawa noted in an email that "[the] project is complete at this time."[6] A410. On February 2, JMR installed a temporary power converter. A11-12. One day later, on February 3, JMR removed its construction office trailer from the work site. A37. As JMR's Quality Assurance Reports demonstrate, JMR performed six days of field work after this date. A13, A39, A41-2, A130-36, A384-85. Despite Ms. Kawa's statement, however, two substantial tasks remained before the project could be finished: installation of a permanent power converter and permanent ceiling lights in Room 109. Def.'s S.J. Mot. at 7; Pl.'s Resp. at 10.

The manufacture and installation of the permanent power converter was the "longest critical path delay" on the project. Pl.'s Resp. at 6; Def.'s S.J. Mot. at 5-6. The power converter was a custom-built unit, requiring 6 months to fabricate. *Id.* Whether this schedule was known to JMR is a matter of considerable dispute between the parties. Def.'s Reply at 13; Pl.'s Resp. at 10. It was not until May 26, 2009 that Choice Construction, Inc. ("Choice"), JMR's electrical subcontractor, could accept delivery of the permanent converter and install it. A13. But, Choice did not connect the converter immediately because no manufacturer's representative was present, as the contract required. *Id.* On July 14, 2009, the converter was finally connected and tested. A39. Installation was not completed, however, because Choice would not connect the converter without receiving a variation for the Underwriters Laboratories' approval.[7] *Id.* On August 6,

---

the facility's pre-engineered metal buildings. A252-53. The third modification added four days due to issues with an oil-water separator. A254-56. The fourth change was a unilateral modification extending the completion date by 14 days to December 4, 2008.

[4] Defendant notes that it "do[es] not concede that steel-related delay ended on December 10, 2008." Def.'s S.J. Mot. at 4.

[5] This citation references the appendix attached to plaintiff's motion.

[6] JMR disputes defendant's characterization of this statement but concedes that "to the extent that 'project' is interpreted to mean physical job site, this statement is accurate." Pl.'s Proposed Findings of Disputed Facts ¶ A.3.

[7] Underwriters Laboratories is a safety consulting firm that "certifies, validates, tests, inspects, audits, and advises" on the safety of products in categories such as "Commercial & Industrial, Environment, Information & Insights, Life

2009, the converter was connected to the facility and energized.  A41.  In total, the converter was installed in 3 days, stretched over a 73 day period.  Def.'s S.J. Mot. at 5; Pl.'s Resp. at 6.

Installation of permanent lighting in Room 109 was delayed by complications with the ceiling's design.  Def.'s S.J. Mot. at 7; Pl.'s Resp. at 5-6.  On November 1, 2008, JMR submitted a Request for Information ("RFI") to the COE in order to clarify problems JMR had identified with the design of the ceiling.  *Id.*  As JMR explains, complications arising from evaporative coolers[8] in a separate building required new ductwork, as well as reconfigured sprinkler and mechanical systems.  *Id.*

In response to JMR's RFI, the COE issued a solicitation, designated AV006, for the needed revisions to Room 109's ceiling.  Def.'s S.J. Mot. at 7.  On March 24, JMR and the COE reached an agreement covering the direct labor portion of the work included in solicitation AV006, as well as seven other changes.  *Id.*  These issues delayed the installation of permanent lighting, which was not completed until 142 days later, on August 13, 2009.  *Id*; Pl.'s Resp. at 5.

In addition to the four days of on-site work needed to address the power converter and lighting, JMR conducted off-site work between January 16 and September 4.  Def's S.J. Mot. at 4.  Defendant contends that JMR conducted only two days of off-site work, receiving and transmitting contract submittals.  *Id.*  On August 28, JMR submitted documentation relating the power converter.  A358, A362; Compl. ¶¶ 8, 14.  On September 4, 2009, JMR received the COE's acknowledgment of JMR's transmittals.  *Id.*  JMR argues it performed significant additional work, averring that it was in almost daily communication with the COE.  Pl.'s Proposed Findings of Disputed Facts ¶ A.5.  Regardless, it is uncontroverted that the four days of on-site work spent installing the power converter and lighting and the off-site administration comprise the field work performed by JMR over the period at issue in this motion.  Compl. at ¶¶ 12-14; Def.'s S.J. Mot. at 12.

In an attempt to recover these costs, JMR submitted several requests for equitable adjustment ("REAs") to the COE.  JMR's first REA was submitted on November 10, 2009.  A248.  Plaintiff submitted a revised REA on several months later, on February 2, 2010.  A379.  The COE's contracting officer denied the revised REA on March 25, 2010.  Def.'s S.J. Mot. at 9; Compl. ¶9.

## II. JURISDICTION AND STANDARD OF REVIEW

### A. Jurisdiction

Plaintiff brings a breach of contract claim, under the Contract Disputes Act of 1978.  Compl. ¶1; 41 U.S.C. § 7104.  The Tucker Act expressly confers on the Court of Federal Claims jurisdiction to hear such claims.  *See* 28 U.S.C. § 1491(a)(2) (providing jurisdiction over "any

---

& Health, Consumer, Enterprise Services, and Workplace Health & Safety."  Available online at
http://www.ul.com/global/eng/pages/aboutul/whatwedo/.

[8] Evaporative cooling is a technology that has been used "[t]hroughout the ages," based on the latent heat of vaporization required to transform water from a liquid into a gas.  BARUCH GIVONI, PASSIVE LOW ENERGY COOLING OF BUILDINGS, 131-32 (1994).  Because "the amount of heat absorbed in the process of water evaporation (its latent heat) is very high in comparison with the other modes of heat transfer common in buildings[,]" water evaporation produces a cooling effect.  *Id.*

claim by or against, or dispute with, a contractor arising under section [The Contract Disputes Act of 1978]"). Additionally, the Contracts Disputes Act of 1978 itself provides jurisdiction to this court when, as is the case here, a contractor has appealed the agency contracting officer's decision unsuccessfully, in accordance with the statute. Compl. at ¶1; 41 U.S.C. § 7104(b)(1).

## B. Summary Judgment Standards

Summary judgment is a "salutary method of disposition designed 'to secure the just, speedy and inexpensive determination of every action.'" *Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1562 (Fed. Cir. 1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). It is well known that summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled of judgment as a matter of law. RCFC 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This is not to say that all issues of fact preclude summary judgment; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

Although a party seeking summary judgment "bears the initial responsibility of informing the [court] of the basis for its motion," the movant does not bear the burden of producing evidence that demonstrates an absence of material fact. *Celotex* 477 U.S. at 323-324. Instead, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the [court]—that there is an absence of evidence to support the nonmoving party's case." *Id.* The burden then shifts to the non-moving party to go "beyond the pleadings" and produce evidence showing there is a genuine issue of material fact. *Id.*

## III. DISCUSSION

Defendant petitions this court for summary judgment on JMR's alleged field overhead damages from February 4 to September 4, 2009 and JMR's alleged home office overhead damages. Def.'s S.J. Mot. at 10. Furthermore, defendant contends that JMR's alleged fee and bond/insurance damages—which are derived as percentages of its field and home office overheads—should be reduced by an amount proportional to any reduction in available overhead damages. *Id.*

## A. Field Overhead Damages

Field overhead costs, otherwise known as jobsite overhead, are administrative costs that "increase as a result of passage of time on a project," such as field worker salaries, work trailer costs, and temporary utility fees. WILLIAM SCHWARTZKOPF & JOHN J. MCNAMARA, CALCULATING CONSTRUCTION DAMAGES 157-58 (2000). These costs are recoverable damages in this court. *See e.g., Cmty. Heating & Plumbing Co., Inc. v. Kelso*, 987 F.2d 1575 (Fed. Cir. 1993); *M.H. McCloskey, Jr., Inc. v. United States*, 66 Ct.Cl. 105 (1928).

Defendant contends that summary judgment over JMR's alleged field overhead damages for the period between February 4 and September 4, 2009 is appropriate because JMR "did not occupy the field," a phrase which, in the instant case, refers to the plaintiff's job site work and not the pre-emption doctrine. *See e.g., Beneficial Nat. Bank v. Anderson*, 539 U.S. 1 (2003) (discussing the pre-emption doctrine generally); Def.'s S.J. Mot. at 11. In defendant's view, JMR has not demonstrated a sufficient "field presence" to recover damages for field overhead.

*Id.*  According to defendant, "JMR cannot demonstrate [field overhead damages] without showing a presence in the field.  On February, 3, 2009, JMR removed its job trailer from the job site, thereby precluding it from showing a field presence beyond this date."  *Id.* at 10-11. Furthermore, defendant maintains that any work performed after JMR removed its job trailer was "sufficiently minimal to obviate a field presence by JMR."  Def.'s Reply at 5.

Plaintiff, in response, argues that defendant's position is a "novel concept," resulting from a "misunderstanding" of the nature of field overhead costs.  Pl.'s Resp. at 3.  Plaintiff suggests that "field overhead" is essentially a misnomer, as costs of this type are "not really 'overhead'. . . but rather . . . are labeled 'field overhead' because [they do] not directly involve physical construction tasks as much as [they] administratively support those actually doing the direct construction activities."  *Id.*  Put simply, plaintiff contends that defendant's argument misconstrues the nature of field overhead damages.  *Id.*

The court will not grant summary judgment on this issue.  Defendant contends that summary judgment is appropriate because JMR "did not occupy the field" and, therefore, "cannot demonstrate" it is entitled to field overhead damages.  Def.'s S.J. Mot. at 11.  In other words, defendant argues that plaintiff did not perform work on site during the critical period. This amounts to an argument that there is an "absence of evidence" to support JMR's alleged field overhead damages.  *Celotex* 477 U.S. at 323-324.  But, defendant's argument that JMR did not occupy the field appears to be squarely rebutted by uncontroverted evidence, JMR's Quality Assurance Reports.  A13, A39, A41-2, A130-36, A384-85.  These reports show that JMR completed six days of field work after February 3.  *Id.*  Given this evidence that JMR completed field work during the period at issue, defendant's argument for summary judgment must fail.

## B. Home Office Overhead Damages

The term "home office overhead" refers to the general administration costs of running a business, such as accounting and payroll services, general insurance, salaries of upper-level management, heat, electricity, taxes, and depreciation.  *See e.g., Interstate Gen. Gov't Contractors, Inc. v. West*, 12 F.3d 1053, 1058 (Fed. Cir. 1993).  These are indirect costs, "expended for the benefit of the whole business, [and thus] by their nature cannot be attributed or charged to any particular contract."  *Nicon, Inc. v. United States*, 331 F.3d 878, 882 (Fed. Cir. 2003) (quoting *Altmayer v. Johnson,* 79 F.3d 1129, 1132 (Fed.Cir.1996)).

Contractors typically recoup these indirect costs by allocating them to individual contracts in proportion to those contracts' direct costs.  *Charles G. Williams Constr., Inc. v. White,* 271 F.3d 1055, 1057–58 (Fed.Cir.2001); Ralph C. Nash & John Cibinic, *Unabsorbed Overhead and the "Eichleay" Formula: Rampant Confusion,* 16 No. 5 Nash & Cibinic Report ¶ 23 (May 2002).  But, in the event of a government-caused delay or suspension of work, "the stream of direct costs against which to assess a percentage [of home office overhead]" is decreased.  *C.B.C. Enterprises, Inc. v. United States*, 978 F.2d 669, 671 (Fed. Cir. 1992).  The resulting shortfall is termed "unabsorbed" home office overhead.  *Nicon* 331 F.3d at 882.

The Circuit has held that the so-called "*Eichleay*" formula is the sole method through which contractors are able to recover unabsorbed home office overhead.  *See E.R. Mitchell Constr. Co. v. Danzig*, 175 F.3d 1369, 1372 (Fed. Cir. 1999) (citing *Eichleay Corp.*, ASBCA No. 5183, 60-2 B.C.A. (CCH) ¶ 2688 (ASCBA 1960)).  The *Eichleay* formula requires that contractors satisfy several "strict prerequisites."  *Nicon* 331 F.3d at 882.  First, the contractor

must demonstrate that there was a government-caused delay not excused by a concurrent contractor-caused delay.  *P.J. Dick Inc. v. Principi*, 324 F.3d 1364, 1370 (Fed. Cir. 2003). Second, the contractor must show that it incurred additional overhead expenses, either because the contract's performance period was extended or because the contractor would have finished prior to the un-extended performance period's close.  *Id.*  Third, the contractor must establish that it was required to remain "on standby" for the duration of the delay.  *Id.*

In order to establish standby, contractors must demonstrate three things.  *P.J. Dick Inc.* 324 F.3d at 1371-1372.  First, the contractor must show that the government caused delay was "not only substantial but was of an indefinite duration." *Id.* at 1371.  Second, the contractor must demonstrate that, during the delay, it was required to return to work "at full speed and immediately." *Id.*  Third, the contractor must show a suspension of most if not all of the contract work.  *Id.*  If the contracting officer has issued a written stop work order proving these elements the contractor can utilize that order to provide direct evidence of standby.  *Id.*  Otherwise, these elements can be proven through indirect evidence.  *Id.*

If the contractor can make a *prima facie* showing of the standby elements, "the burden of production shifts to the government to show either that it was not impractical for the contractor to obtain "replacement work" during the delay, or that the contractor's inability to obtain or perform replacement work was caused by a factor other than the government's delay." *Nicon* 331 F.3d at 883.

Defendant contests JMR's ability to establish all three of the elements required to demonstrate standby.  Def.'s S.J. Mot. at 14.  Defendant will have carried its burden for summary judgment if it can show that there is an absence of evidence to support JMR's case with regard to any single standby element.  *Celotex* 477 U.S. at 323-324; *P.J. Dick Inc.* 324 F.3d at 1371-1372.  There are two distinct periods at issue in this case: January 16 to February 3, 2009 and February 4 to September 4, 2009.  Defendant advances discrete arguments for each period.

*(a.) From January 16 to February 3, 2009*

This period extends from the day after the COE took possession of the facility to the date JMR removed its work site trailer.  Defendant avers that JMR cannot establish standby for this time period because JMR cannot establish that the contract work had been suspended.  Def.'s S.J. Mot. at 15-16.  Since standby is a required element of the *Eichleay* formula, *see P.J. Dick Inc.*, 324 F.3d at 1371-1372, defendant concludes summary judgment on home office overhead damages for this period is appropriate.  *Id.*

As defendant notes, the COE did not issue a stop work order in this case.  Def.'s S.J. Mot. at 15.  Thus, in order to recoup home office overhead damages under *Eichleay*, JMR must establish suspension of most if not all of the contract work through indirect evidence.  *P.J. Dick Inc.* 324 F.3d at 1371-1372.  Defendant avers that JMR "cannot establish a suspension of work" because JMR performed significant on-site work during this period, with JMR's work force averaging over 10 hours of work per day.  Def.'s Reply at 7.

JMR rebuts this argument by claiming that the work completed during this period was minor in nature, and thus does not prevent it from proving standby.  JMR characterizes the work

as "changed contract work" and resolution of "minor punch list items." Pl.'s Proposed Finding of Disputed Facts ¶ A.3. JMR's expert, John Elmer, supports this assertion in his declaration, which states that all of the critical path work completed during this period was either disputed or undisputed "changed contract work" or original base contract work that was "dependent upon the completion of the changed work." Elmer Decl. at 2.

The parties present divergent views of the nature and significance of the work JMR completed during the relevant timeframe. Summary judgment on this issue is therefore inappropriate because the nature of the work bears directly on plaintiff's ability to recover under the *Eichleay* formula. Contractors that perform "minor tasks" during a government-caused delay are not precluded from proving standby. *See e.g., Altmayer v. Johnson*, 79 F.3d 1129 (Fed. Cir. 1996). The *Eichleay* formula does not "require that the contractor's work force be idle." *Interstate*, 12 F.3d at 1057. It is sufficient, for purposes of establishing standby, if a contractor can demonstrate that work was "stopped or significantly slowed." *P.J. Dick Inc.* 324 F.3d at 1372-1373; JOHN CIBINIC, JR. & RALPH C. NASH, JR., ADMINISTRATION OF GOVERNMENT CONTRACTS 737 (3d ed. 1995).

The court cannot make a determination on whether work was sufficiently suspended such that JMR was on standby without resolving the parties' factual dispute on this point. Accordingly, the court denies defendant's motion for partial summary judgment with respect to this issue.

*(b.) From February 4 to September 4, 2009*

This period encompasses the remaining time at issue, 213 days which were largely spent waiting for the manufacture and delivery of the permanent power converter unit and the eventual installation of permanent lighting in Room 109. Defendant argues that JMR cannot establish standby under the *Eichleay* formula for this timeframe because: (i) the project delays were not indefinite in nature and (ii) JMR was not required to return to work at full speed and immediately. Def.'s S.J. Mot. at 7. Defendant also contends that the "lengthy gaps" between JMR's four total days of on-site work during this 213 day period demonstrate a "lackadaisical pace" of work inconsistent with standby. *Id.* at 21.

Defendant contends that the project delays during this period were not indefinite because the timeframe for the primary source of the delay, production of the permanent power converter, was "not unknowable." Def.'s Reply at 13. Defendant goes as far as to argue that the fact that "[JMR] knew when it could expect delivery is beyond dispute." Def.'s Reply at 13. Further, defendant contends that any opposition on this point is undermined by the fact that COE was provided a delivery timeframe update two days after its inquiry. Def.'s Reply at 12-13; A412-13.

JMR flatly denies defendant's assertion that the power converter had a definite delivery timeframe, stating that the unit's delivery date was "totally unknown." Pl.'s Resp. at 10. JMR notes that the power converter was a "custom pro-type unit" that required special manufacture. *Id.* JMR also submits Mr. Elmer's declaration, which states that the converter's "delivery date remained uncertain until April 1 . . ." when the manufacturer advised JMR the converter would be delivered on May 15. Elmer Decl. at 2. Notably, JMR does not reconcile the fact that it "informed [the COE] of a six month manufactures [sic] fabrication time" in November of 2008

with its assertion that the timetable for construction was unable to be ascertained.  Pl.'s Resp. at 9.

Nevertheless, it is clear that whether the power converter's delivery schedule was knowable is a disputed fact.  Def.'s Reply at 13; Pl.'s Resp. at 10.  It is equally clear that this issue bears directly on whether the project's delays were indefinite in nature.  If the converter's delivery date was, in fact, unknowable, the delay caused by the converter's manufacture could have been indeterminate in duration.

But, for JMR to establish standby Circuit precedent requires that JMR satisfy all three standby elements: indefinite delay, required to return to work at full speed and immediately, and suspension of work.  *P.J. Dick Inc.* 324 F.3d 1371-1372.  Although disputed facts preclude summary judgment based on the issue of indefinite delay, summary judgment is still appropriate if defendant demonstrates plaintiff is unable to prove either of the remaining elements of the three-part standby test.  *Id.*

Defendant argues that JMR was not required to return to work "at full speed and immediately" for two reasons.  First defendant contends that the remaining contract tasks, installation of the permanent power converter and lighting in Room 109, had already been addressed with temporary stopgap measures.  A11-12.  Defendant claims that these stopgaps "removed any requirement to resume contract work at full speed and immediately."  Def.'s S.J. Mot. at 16-17.  Second, defendant argues that JMR's use of an electrical subcontractor, Choice, to complete these tasks prevents JMR from establishing it returned to work at all.  Def.'s S.J. Mot. at 17-18.  Defendant further argues that "JMR's response effectively concedes that it was only monitoring the contract."  Def.'s Reply at 9.  Defendant also cites to prior decisions by this court, which have commented that "extensive use" of subcontractors can limit a contractor's ability to demonstrate standby.  Def.'s S.J. Mot. at 17-18 (citing *Redland Co. v. United States*, 97 Fed. Cl. 736, 746 (2011)).

Summary judgment on the issue of standby is appropriate because JMR cannot establish that it was required to return to work at full speed and immediately.  As the Circuit commented in *P.J. Dick*, "satisfaction of this element of standby clearly requires something more than an uncertain delay as this is a separate requirement of the case law; the implication is that the contractor must be required to keep at least some of its workers and necessary equipment at the site, even if idle, ready to resume work on the contract."  *P.J. Dick Inc.,* 324 F.3d at 1371 (citing *Sergent Mech. Sys. v. United States,* 54 Fed. Cl. 47, 49-50 (2002)).  This is not to say that idle workers are necessary to demonstrate standby.  *Interstate*, 12 F.3d at 1057 n. 4 (stating that "[a]lthough idleness of workers is evidence that a contractor is on standby, i.e., performance has been suspended, it is neither conclusive nor required.").  But, the element does require contractors to show they were required to return to work with some degree of urgency.  *See Mech–Con Corp. v. West*, 61 F.3d 883 (Fed.Cir.1995) (holding a contractor could not establish standby when allowed 3 months to remobilize its work force).

JMR cannot demonstrate it was required to return to work at full speed and immediately because the project's outstanding construction tasks were not time-sensitive in nature.  Both of the remaining tasks had been addressed months earlier with stopgap measures.  A11-12.  These stopgaps removed any requirement for JMR to resume construction activities with urgency

because the COE was in possession of an aircraft maintenance facility with fully functional power and lighting systems in place.  Circuit precedent on this issue makes clear that to demonstrate standby a contractor must establish that the government required the contractor to remain poised to resume work.  *See e.g., P.J. Dick Inc.,* 324 F.3d at 1371.

Defendant has carried its burden by showing that "there is an absence of evidence to support the non-moving party's case."  *Celotex* 477 U.S. at 323-24.  JMR has not produced any evidence to rebut defendant's assertion and demonstrate that the outstanding construction tasks were time-sensitive.  Accordingly, the court will grant summary judgment on this issue.

## C. Fee Damages and Bond / Insurance Damages

Defendant argues the court should grant summary judgment on a portion of these damages, adjusting them in proportion to any reduction in field and home office overhead damages.  Def.'s S.J. Mot. at 24-25.  Defendant avers that an adjustment is appropriate because "these numbers are simply percentages of the claimed field and home office overhead."  *Id.*

The court will not grant summary judgment on these damages because their relationship to plaintiff's alleged field and overhead damages is unclear.  Defendant's suggestion that plaintiff's fee damages and bond/insurance damages are directly correlated could be accurate.  Or these damages could have some other relationship to those sums.  Because this issue has not been adequately explored and further proceedings will determine any available quantum of fee and bond/insurance damages, summary judgment on these issues is not appropriate at this time.

## IV. CONCLUSION

For the reasons set forth above, defendant's MOTION for partial summary judgment under RCFC 56 is GRANTED-IN-PART and DENIED-IN-PART.  To the extent that defendant's motion addresses plaintiff's damages for painting expenses, scheduling costs, consulting costs, and home office overhead damages for the periods between December 11, 2009 and January 15, 2009, as well as the period between February 4 and September 4, 2009 the MOTION is GRANTED.  To the extent that defendant's motion addresses field overhead damages, home office overhead damages from the period of January 16 to February 3, 2009, and fee and bonding/insurance damages, the MOTION is DENIED.

**IT IS SO ORDERED.**

*s/ Lawrence J. Block*

Lawrence J. Block
Judge